# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-60569-CIV-JJO

**ADEM ALBRA,**

      **Plaintiff,**

**v.**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security**
**Administration,**

      **Defendant.**

_____/

## ORDER

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment (DE# 43, 9/20/2017) and the Defendant's Motion for Summary Judgment (DE# 41, 09/14/2017). The plaintiff requests the final decision of the Commissioner of Social Security be reversed and Disability Insurance Benefits ("DIB") be granted under Title II of the Social Security Act ("SSA").  The complaint was filed pursuant to the Social Security Act ("SSA"), 42 U.S.C. §405(g), and is properly before the Court for judicial review of a final decision of the Commissioner of the SSA. The parties consented to Magistrate Judge jurisdiction, (DE# 28, 07/12/2017), and this matter was reassigned to the undersigned pursuant to Judge Altonaga's Order dated July 13, 2017. (DE# 30, 07/13/2017). Having carefully considered the filings and applicable law, the undersigned enters the following Order.

## PROCEDURAL HISTORY

In May 2014, Adem Albra ("the plaintiff") filed an application for Disability Insurance Benefits (hereinafter "DIB") alleging a disability onset date of February 10, 2012. (Tr. 140-43, 153).[1] The plaintiff's application was denied initially and upon reconsideration. (Tr. 73, 86). The plaintiff requested a hearing before an administrative law judge ("ALJ") which was held on June 13, 2016. (Tr. 26–61). On October 21, 2016, the ALJ denied the plaintiff's application. (Tr. 13–21). The plaintiff filed an appeal to the Appeals Council requesting review of the ALJ's decision. The Appeals Council denied the plaintiff's request for review on February 24, 2017. (Tr. 1–6). The plaintiff has exhausted his administrative remedies and this case is ripe for review under 42 U.S.C.§ 1383(c)(3). The defendant filed the Defendant's Motion for Summary Judgment (DE# 41, 09/14/2017) on September 14, 2017, the plaintiff filed a response on September 25, 2017 (DE # 44, 9/25/17), and the defendant filed a reply on October 20, 2017 (DE # 46, 10/20/17). The plaintiff filed the Plaintiff's Motion for Summary Judgment (DE# 43, 9/20/2017) on September 20, 2017, the defendant filed a response on October 20, 2017 (DE # 46, 10/20/17), and the plaintiff filed a reply on October 25, 2017 (DE # 47, 10/25/17).

## FACTS

### I. Plaintiff's Background

The plaintiff was born in 1971, and was 45 years old at the time of the ALJ's

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration. Moreover, the page numbers refer to those found on the lower right hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers that may appear.

decision (Tr. 153).  The plaintiff attended community college, but did not obtain a

degree.  (Tr. 31).  According to the plaintiff, he was "kicked out from a public college".

(Tr. 47).  The plaintiff has past work experience as a sales representative, sales

manager, and administrative assistant.  (Tr. 20, 65, 157).  The plaintiff alleged disability

based on human immunodeficiency virus (HIV) and acquired immune deficiency system

(AIDS), secondary polycythemia, hypothyroidism, HIV related cognitive

problems/wasting, chronic fatigue, gastric reflux, gum disease, severe depression, and

general anxiety disorder.  (Tr. 156).

## II. Medical Evidence - Physical Impairments

On June 14, 2013, the plaintiff was evaluated by Esther Schumann, M.D. at

Northpoint clinic.  (Tr. 335-41).  No significant symptoms were noted at that time.  (Tr.

337).  Dr. Schumann's findings were mostly normal, with the exception of some skin

issues.  (Tr. 338).  Dr. Schumann diagnosed the plaintiff with AIDS, hypothyroidism,

gastroesophageal reflux disease (GERD), and depression.  (Tr. 338).  Dr. Schumann

prescribed a number of medications. (Tr. 339).  The plaintiff saw Dr. Schumann on

June 28, 2013, for a follow up visit.  The physical exam findings on June 28, 2013, were

normal and the therapies in place for the plaintiff were continued.  (Tr. 331-32).  The

plaintiff saw Dr. Schumann again on September 28, 2013, for his quarterly HIV visit.  At

that time, the plaintiff complained of cold-like symptoms, pain in his left ear, and the

smell of fungus for two (2) weeks.  (Tr. 312).  With the exception of plethoric skin and

redness of the tympanic membrane in the plaintiff's left ear, Dr. Schumann's physical

exam findings were relatively normal.  (Tr. 316).  The plaintiff's treatment remained

basically the same, but a prescription was made for Diflucan to treat the plaintiff's

3

athlete's foot.  (Tr. 317).

The plaintiff went to the emergency room on September 28, 2013, complaining that it was difficult for him to breathe.  (Tr. 375).  Scott Meyer, M.D., the emergency room doctor, noted exam findings as normal and diagnosed the plaintiff with bronchitis and otitis media.  (Tr. 376-77).  A chest x-ray was taken, and there was no finding of acute cardiopulmonary disease.  (Tr. 378).  At that time, the plaintiff was prescribed medications to treat his bronchial issues (Tr. 377).

The plaintiff visited Northpoint clinic in October 2013, for a follow-up visit regarding his HIV.  (Tr. 307).  Normal exam findings were made by Robert Heglar, M.D..  The plaintiff was continued on virtually the same therapies, but a prescription was added for anxiety.  (Tr. 309-10).

The plaintiff returned to Northpoint clinic on January 16, 2014, complaining of pink eye.  (Tr. 292).  The plaintiff reported no change in his vision at that time.  (Tr. 294).  Nancy Garcia, M.D. examined the plaintiff, and found that the plaintiff's upper eyelid was swollen and the plaintiff had red conjunctiva.  (Tr. 295).  The plaintiff was diagnosed with acute conjunctivitis in the right eye, and prescribed medications to treat the conjunctivitis.  The plaintiff went to the emergency department due to discomfort and redness in his right eye, on January 18, 2014.  (Tr. 368).  The plaintiff did not report any vision loss at that time.  (Id.).  John Marini, a physician's assistant examined the plaintiff and found a corneal abrasion.  Mr. Marini also noted that the plaintiff's visual acuity, with correction, was 20/20.  (Tr. 370).  The plaintiff was prescribed an ophthalmic solution for the corneal abrasion.  (Tr. 371).

The plaintiff went to Northpoint clinic complaining about an abscessed tooth in

4

February 2014. (Tr. 287). The plaintiff denied any symptoms related to his eyes at that time. (Tr. 288). The findings of Arlene Spertus, M.D. were normal (Tr. 289), and the plaintiff's therapies were continued. (Tr. 290). In March 2014, the plaintiff saw Dr. Garcia two times, and denied any issues on those visits. The physical exam findings of Dr. Garcia were relatively normal at that time, and the plaintiff's therapies were continued. (Tr. 262-68, 282-86).

The plaintiff went to the emergency department in May 2014, for contact dermatitis. (Tr. 246-51). Eye issues were negative. (Tr. 361). Except for a rash on the plaintiff's back and arms, the doctor's physical exam findings were normal. (Tr. 363). The plaintiff was given medication for his rash. (Tr. 364).

The plaintiff went to Northpoint clinic on June 16, 2014, for an acute upper respiratory infection. (Tr. 246). The plaintiff did not indicate any eye issues at that time. (Tr. 248). Physical exam findings by James Dwyer, D.O. were normal. (Tr. 249). The plaintiff's therapies remained unchanged, except he was prescribed medications for his respiratory infection. (Tr. 250). The plaintiff visited Dr. Dwyer again on June 27, 2014, for a follow-up visit. (Tr. 431-37). Dr. Dwyer's physical exam findings were normal and the plaintiff denied any issues related to his eyes. (Tr. 433-34). The plaintiff's AIDS symptoms were assessed as asymptomatic by Dr. Dwyer. (Tr. 435).

The plaintiff went to the emergency room and to see Dr. Dwyer in August 2014, with respect to a rash and an abscess on his back. (Tr. 354-56, 424-30). The plaintiff's condition improved when the abscess was drained. (Tr. 355-56). The plaintiff's AIDS was again assessed as asymptomatic. (Tr. 427).

The plaintiff saw Dr. Dwyer for follow-up treatment regarding his AIDS in October

2014, February 2015, and May 2015.  (Tr. 404-23).  The plaintiff denied any eye issues at each of the visits.  (Tr. 405, 412, 419).  The plaintiff's AIDS was assessed as asymptomatic by Dr. Dwyer, and Dr. Dwyer made normal physical exam findings.  (Tr. 407-08, 414-15, 421-22).  The plaintiff's therapies were continued.  (Tr. 410, 415, 422).

Dr. Dwyer diagnosed the plaintiff with herpes based on the plaintiff's hospitalization, but admitted to not reviewing the plaintiff's hospital records.  (Tr. 397). Dr. Dwyer explained the diagnosis by stating that he "can think of few infections that would result in corneal scarring outside of HSV." (Tr. 401).

The plaintiff went to the emergency room on May 17, 2015, complaining of pain in his left eye.  The plaintiff indicated that the pain was a result of pepper sauce accidently entering his eye while he was at a Mexican restaurant.  (Tr. 515).  The plaintiff was found to have 20/25 vision in both eyes with correction, and the plaintiff indicated that his vision had not changed.  (Tr. 515, 517).  The plaintiff was examined by a physician's assistant named Charles Delaney, who did not find any corneal abrasions on the plaintiff's eyes, but diagnosed the plaintiff with conjunctivitis in both eyes.  (Tr. 518).  The plaintiff received medication for his eyes. (Id.).

The plaintiff was admitted to the hospital on May 19, 2015, for pain in the right eye, and indicated that in 2007, he had experienced a similar "eyelid cellulitis".  (Tr. 501).  The plaintiff also reported blurred vision.  (Id.).  Michael Estep, M.D., the emergency room physician, diagnosed the plaintiff with visual impairment and orbital cellulitis.(Tr. 504).  A CT scan of the plaintiff's right eye was performed by Michael B. Gordan, M.D., a radiologist, and Dr. Gordan noted that there was soft tissue swelling around the plaintiff's right eye and no other acute process.  (Tr. 505).  Dr. Gordan

indicated that the swelling could be cellulitic process and advised for correlation.  (Id.).

Internist Nesreen Kurtom, D.O. examined the plaintiff on May 20, 2015.  (Tr. 495).  Dr. Kurtom found: that the plaintiff's pupils were equal and reactive to light; that his extraocular muscles were intact with periorbital tenderness, erythema, and redness in the right eye; and that his visual acuity was impaired.  (Id.).  Dr. Kurtom made the following diagnoses: visual impairment; orbital cellulitis in the right eye; a history of HIV, a history of staph infection in the right eye; and hypothyroidism and prescribed medications.  (Id.).  Ranya Habash, M.D., an ophthalmologist, diagnosed the plaintiff with a corneal ulcer and periorbital cellulitis, after examination. (Tr. 500).  The plaintiff was examined by infectious disease specialist Yared Aklilu, M.D. on May 21, 2015, who indicated that the plaintiff had a history of staph infection in his right eye from 2007.  (Tr. 496).  Dr. Aklilu doubted that the conditions from which the plaintiff suffered were herpes simplex conjunctivitis or a corneal ulcer, and suggested treating the plaintiff for staph and strep infections.  (Tr. 498).  On May 22, 2015, the plaintiff was discharged from the hospital.  (Tr. 493).

The plaintiff saw Dr. Dwyer on May 29, 2015, for a follow up appointment regarding his eye.  (Tr. 397-403).  Dr. Dwyer indicated that he had not reviewed the records from the plaintiff's hospital stay, and noted the plaintiff's condition as herpes simplex with other ophthalmic complications. (Tr. 397).  Dr. Dwyer thought the plaintiff's condition had somewhat remitted, but suggest he visit an ophthalmologist.  (Id.).   The findings of Dr. Dwyer were basically normal. (Tr. 400).  The specific findings regarding the plaintiff's eyes were "PERRL/EOM intact, conjunctiva and sclera clear with out nystagmus."  (Id.).  The plaintiff's AIDS symptoms were assessed as asymptomatic by

Dr. Dwyer.  (Tr. 401).  Dr. Dwyer's impressions and recommendations regarding the plaintiff noted "herpes simplex with other ophthalmic complications" and Dr. Dwyer explained that he "can think of few infections that would result in corneal scarring outside of HSV".  (Id.).  The plaintiff received a prescription.  (Id.).

In August 2015, October 2015, February 2016, and March 2016, the plaintiff saw Dr. Dwyer.  (Tr. 389-96, 691-712).  On each visit, the plaintiff denied any eye issues, (Tr. 390, 692-699, 707), the doctor made normal examination findings, (Tr. 393-94, 694-95, 701-02, 709-10), and the doctor noted the plaintiff's AIDS symptoms to be asymptomatic.  (Tr. 393, 695, 702, 710).  Antiretroviral therapies were continued on the plaintiff.  (Id.).

On a form entitled Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection dated October 12, 2015, Dr. Dwyer checked off the box indicating that the plaintiff's HIV infection was diagnosed via laboratory testing confirming HIV infection.  (Tr. 485).  Dr. Dwyer also checked the box indicating the herpes simplex virus causing "mucocutaneous infection (e.g. oral, genital, perianal) lasting for 1 month or longer, or infection at a site other than the skin or mucous membranes (e.g. bronchitis, pneumonitis, esophagitis, or encephalitis), or disseminated infection" was applicable to the plaintiff.  (Id.).  There were no other remarks on the form.  (Tr. 485-87).

While the plaintiff treated at Northpoint clinic, he was tested for HIV viral load and CD4 count.  (Tr. 271-72, 300, 302, 320-21, 326, 342, 349, 440, 442, 449, 454-55, 458, 462, 467, 471, 475, 728-29, 735, 737).  The plaintiff's viral load ranged from less than twenty (i.e. undetectable) to 510, with an average viral load of 78.  (Tr. 271, 300,

8

320, 326, 349, 440, 454-55, 467, 471, 728, 735).[2]  The plaintiff's CD4 counts ranged

from 825 to 1218, and the average was 997.  (Tr. 272, 308, 321, 342, 442, 449, 458,

462, 475, 729, 737).[3]

### III. Medical Evidence - Psychological Impairments

The plaintiff began treating with psychiatrist Amy Kosches, M.D. in March 2012,

for a depressed mood, issues related to sleep, and increased anxiety.  (Tr. 386).  The

plaintiff indicated that he was prescribed 10 mg of Lexapro by his primary care

physician and had been taking the medication for 8 years.  (Id.).  Upon examination, Dr.

Kosches found the plaintiff had a depressed and anxious mood, and a constricted

affect.  (Tr. 387).  Dr. Kosches increased the plaintiff's Lexapro dosage to 20 mg.  (Tr.

388).

The plaintiff saw Branislav Stojanovic, M.D., a psychiatrist , in November 2013,

for complaints of depression, and denied any past psychiatric history.  (Tr. 241).  The

mental status exam findings by Dr. Stojanovic were normal, except for a flat affect and

a depressed mood.  (Tr. 243).  On the mental status evaluation, Dr. Stojanovic noted in

the Liabilities and Special Needs section that the plaintiff had poor coping skills.  (Id.).

Dr. Stojanovic diagnosed the plaintiff with major depressive disorder and assigned the

Global Assessment of Functioning (GAF) of 75 (Tr. 242), indicative of no significant

---

[2] "Viral loads that are consistently less than 200 copies/ml indicate that the virus is adequately suppressed and that the risk of disease progression is low." Lab Tests Online, HIV Viral Load, https://labtestsonline.org/tests/hiv-viral-load (Last visited April 4, 2018).

[3] "A normal CD4 count ranges from 500–1,200 cells/mm3 in adults and teens." Lab Tests Online, CD4 Count, https://labtestsonline.org/tests/cd4-count (Last visited April 4, 2018).

mental symptoms.  See, American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. 2000, Text Rev.) (describing the GAF scale used in Axis V of a diagnostic multiaxial evaluation.  A GAF score of 71-80 is indicative of no more than a slight impairment).  Dr. Stojanovic prescribed medications. (Tr. 244).

The plaintiff saw Dr. Stojanovic in December 2013, and reported that he felt better.  (Tr. 240).  At the visit, the plaintiff indicated that he had some anxiety and requested Valium.  (Id.).  The plaintiff was prescribed 10 mg of Valium as needed.  (Id.). The plaintiff visited Dr. Kosches in July 2014, and indicated that he was experiencing some insomnia and some forgetfulness.  (Tr. 384).  At that time, the plaintiff also indicated that his mood was fair.  (Tr. 383).  Upon examination, Dr. Kosches found the plaintiff to have a depressed and anxious mood, as well as a constricted affect, but otherwise a normal mental status.  (Tr. 385).  Dr. Kosches diagnosed panic disorder, continued the Lexapro, and prescribed the plaintiff additional medications. (Tr. 383).

The plaintiff saw Dr. Kosches in August 2014, at which time the plaintiff indicated that he never began taking one of the medications prescribed by Dr. Kosches the month prior, because the plaintiff thought he had Stevens-Johnson syndrome from his HIV medications and planned to visit his primary care doctor the same day.  (Tr. 383). The plaintiff reported that his mood was fair, and the plaintiff was continued on his same medications.  (Id.).

The plaintiff was examined by a psychologist, Gloria Montes de Oca, Ph.D., on behalf of Miami-Dade College in April 2016.  (Tr. 522-41).  The mental status exam findings were normal.  (Tr. 529-30).  Dr. Montes de Oca diagnosed the plaintiff with narcissistic personality disorder, paranoid personality features, and unspecified

depressive disorder, by history, in remission.  (Tr. 538).  Dr. Montes de Oca did not think the plaintiff's mental conditions were disabling, and specifically stated with respect to the plaintiff that the plaintiff "does not presently demonstrate any acute mental health symptoms that would impair his ability to function in daily life." (Tr. 539).

In addition to the above, the plaintiff indicated that he had the ability to go to school, care for his own personal needs, do household chores, drive, exercise at the gym, and socialize with his friends.  (Tr. 164-66, 263, 283, 293, 314, 330, 337, 433, 526, 530).

## IV. State Agency Consultants

Gloria Hankins, M.D., a state agency consultative physician, reviewed the plaintiff's record in September 2014.  Dr. Hankins opined that the plaintiff retained the ability to perform medium work with no additional physical restrictions (Tr. 80-81).  The plaintiff's record was also reviewed by Beth Klein, Ph.D., a state agency consultative psychologist, who opined that the plaintiff retained the ability to perform simple work with moderate limitations in dealing with others and responding appropriately to changes in the work setting (Tr. 82-84).

## V. Plaintiff's Testimony and Reporting

The plaintiff testified that he previously worked as a sales consultant, manager, and assistant manager in the telecommunications business.  (Tr. 32).  The plaintiff also indicated that his past work includes administrative assistant duties and bartending. (Tr. 32-33).  At the time of the hearing, the plaintiff had a driver's license and drove. (Tr. 35-36).  The plaintiff testified that he has problems getting along with authorities

and with others (Tr. 43) and was kicked out of school for his inability to get along with others. (Tr. 47). The plaintiff attended college until June 2015. (*Id*.). The plaintiff indicated that in a typical day he walks his two (2) dogs, prepares himself something to eat and cleans up in the kitchen area or around the house. (Tr. 53). The plaintiff testified that he does not live alone, and reported living with his significant other. (Tr. 53, 263). The plaintiff reported exercising 5 times a week and doing cardiovascular exercises as well as weights. (Tr. 263).

## VI. Vocational Expert Testimony

A vocational expert (VE) testified at the ALJ hearing. (Tr. 56-60). The ALJ asked the VE to assume an individual with the plaintiff's age, education, work experience, and residual functional capacity (RFC). (Tr. 56-59). The VE testified that while that type of individual could not perform the plaintiff's past relevant work, such an individual would be capable of performing other work in the national economy, such as: a hand packager; a box bender; a collator; and a small parts assembler. (Tr. 57-59).

## ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 416(I); 423(d)(1); 20 C.F.R. § 404.1505 (2017). The impairments(s) must be severe, making the plaintiff "unable to do his previous work . . . or any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1505-404.1511.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 404.1520(a)-(f). The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(1)(I). If so, a finding of non-disability is made and the inquiry ends. *Id.*.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(a)(1)(ii). If the plaintiff does not, then a finding of non-disability is made and the inquiry ends. *Id.*.

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R.§ 404.1520(d), Subpart P, Appendix I. 20 C.F.R. § 404.1520(a)(1)(iii). Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulation requires a finding of disability without further inquiry into the plaintiff's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1517, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" to perform his or her past relevant work. "Residual functional capacity"("RFC"), is defined as "what you can do despite your limitations." 20 C.F.R. § 404.1520(a)(1)(iv). This determination takes into account "all relevant evidence," including medical evidence, the claimant's own testimony, and the observations of others. *Id.* If the plaintiff is unable

to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at the fifth step that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e)-(9); *See Barnes v. Sullivan*, 932 F.2d 1357, 1459 (11th Cir. 1991) (holding the claimant bears the initial burden of proving that he is unable to perform pervious work).

Fifth, if the plaintiff cannot perform his or her past relevant work the ALJ must decide if the plaintiff is capable of performing any other work in the national economy. 20 C.F.R. § 404.1520(a) (1)(v).

## ALJ'S FINDINGS

At step one, the ALJ determined the plaintiff had not engaged in substantial gainful activity since February 10, 2012, the alleged onset date. 20 C.F.R. § 404.1571 *et seq*.). (Tr. 13).

At step two, the ALJ determined that the plaintiff has the severe impairments of "AIDS and an affective and anxiety disorder (20 C.F.R. 404.1520(c))." (*Id*.). The ALJ found these impairments "impose more than a minimal restriction of the claimant's ability to perform basic work activity and, thus, are severe impairments." (*Id*.).

At step three, the ALJ found the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525 and 404.1526)." (*Id*.). The ALJ also found the plaintiff's "mental impairment does not meet or medically equal the criteria of listing 12.04." (*Id*.).

In the decision, the ALJ indicated that "[t]he severity of the claimant's mental

impairment does not meet or medically equal the criteria of listing 12.04." (*Id.*).  In making the aforementioned finding, the ALJ considered whether the "paragraph B" criteria were satisfied. (*Id.*). In order to satisfy the "paragraph B" criteria, "the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 13-14). The ALJ noted the plaintiff has mild restrictions in activities of daily living. (Tr. 16). The ALJ based this finding on the plaintiff's admission that he lives with his significant other and can take care of personal needs such as bathe and dress. (*Id*).  The plaintiff prepares simple meals, does the laundry and light cleaning. (*Id*).  The plaintiff also cares for two dogs, which includes feeding and walking the dogs and shops in stores. (*Id.*). The plaintiff noted that he is in contact with close friends on a daily basis, eats in restaurants, watches television, and that he attended college through June 2015. (*Id.*).

The ALJ found that the plaintiff has moderate difficulties in social functioning.  This finding was based on the fact that the plaintiff has been in a long-term relationship for 20 years, is able to drive and leave his home alone, socializes with friends once a week, exercises at a gym five times a week, but has difficulty getting along with others, especially in an academic setting, and his suspension was not due to an affective disorder or anxiety disorder. (*Id.*).

Regarding concentration, persistence or pace, the ALJ found the plaintiff has moderate difficulties. (Tr. 16). The ALJ relied on the plaintiff self reported statements that he "attended three years of college and was also a student at Miami-Dade College of Nursing until June 2015." (*Id*.). The plaintiff described his past relevant work as sales manager and representative and administrative assistant. The mental status examinations of Drs. Stojanovic and Kosches indicated that the plaintiff's "attention, concentration and memory were intact, along with cognition, intelligence, and orientation". (*Id*.). Dr. Montes de Oca also observed that the plaintiff's "attention, concentration, and memory were normal." (*Id*.). The ALJ also found no episodes of decompensation of extended duration. (*Id*.).

The ALJ noted that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (*Id*.). The ALJ assessed whether the "paragraph C" criteria were satisfied, and noted that the evidence failed to establish the presence of "paragraph C" criteria. (Tr. 17).

At step four, the ALJ determined the plaintiff

> has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c), except: The claimant retains the capacity to understand, remember and carry out short, simple instructions, make simple decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in the routine work setting. He is able to work with others without being distracted and is able to compete a normal workweek with no more than mild interference from mental symptoms. The claimant is able to interact occasionally with supervisors and co-workers and have

no contact with the general public.

(Tr. 17).

The ALJ found the plaintiff's

> medically determinable impairments could reasonably be
> expected to cause the alleged symptoms; however, the
> claimant's statements concerning the intensity, persistence
> and limiting effects of these symptoms are not entirely
> consistent with the medical evidence and other evidence in
> the record . . .

(Tr. 18).

The ALJ opined that the record demonstrated the plaintiff's HIV status was

asymptomatic, his CD4 levels steadily increased over the period in question, his viral

load was less than 20, he had only a small amount of treatment by a mental health

professional, had been given a mild anti-depressant by his primary care doctor, and that

the plaintiff's allegation that he had been suspended from school as a result of a mental

health condition was not supported by the record.  (*Id*.).

The ALJ noted that despite claims by the plaintiff of eye problems the record

does not support the allegations.  (Tr. 19).  The ALJ further noted that the plaintiff's

treating source did not provide an opinion as to the plaintiff's mental or physical

limitations.  (*Id*.).  The ALJ accorded the opinion of Dr. Dwyer great weight because it

was consistent with his lack of objective findings and the plaintiff's asymptomatic HIV

status.  (*Id*.).  The ALJ accorded great weight to the opinion of the State agency

medical consultant who noted that the plaintiff would be able to perform medium work.

(*Id*.).  The ALJ asserted that the opinion of Dr. Gloria Hankins is supported by the lack

of objective findings and the progress notes of Dr. James Dwyer.  (*Id*.).  The ALJ also

accorded great weight to the State agency psychological consultant, because that opinion is consistent with the overall medical evidence and the activities of daily living reported by the plaintiff. (*Id*.)

In summary, the ALJ opined that the RFC was supported by the opinions of the State agency medical and psychological consultants. The ALJ noted that the plaintiff had little mental health treatment, and an April 2016 mental health status did not support findings of anxiety or depression. (*Id*.). The ALJ indicated that the plaintiff's HIV status had been asymptomatic with basically no infections other than a herpes flare up. (*Id*.). The ALJ further noted that the plaintiff had been able to attend school, attend to his personal needs, do household chores, drive, work out in a gym, and socialize. (*Id*.). The ALJ found that based on the VE's classification of the plaintiff's past relevant work, the plaintiff is unable to perform his past relevant work. (Tr. 20).

At step five, the ALJ determined the plaintiff was not disabled because there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. (*Id*.). In making that determination, the ALJ relied on the testimony of the VE, which the ALJ found was consistent with the information contained in the Dictionary of Occupational Titles. (Tr. 21).

## STANDARD OF REVIEW

The Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *see*

*Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding the reviewing court must not re-weigh evidence or substitute their discretion). On judicial review, decisions made by the defendant (the Commissioner of Social Security) are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g) (2006); *see Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). Eleventh Circuit Courts have determined that "substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *See Miles v. Charter*, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact, no presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145011456 (11th Cir. 1991) (holding "Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide the facts anew, reweigh evidence or substitute its judgment for that of the ALJ, and even if the

evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *See Miles*, 84 F.3d at 1400; *see also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *See Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. (*Id.*).

<u>**LEGAL ANALYSIS**</u>

<u>**I. Substantial Evidence Supports the ALJ's Finding that the Plaintiff's Condition Did not Meet a Listed Impairment**</u>

Substantial evidence in the record supports the decision made by the ALJ in this matter. As indicated by the ALJ, the Commissioner of Social Security has a five-step evaluation process to determine whether a plaintiff is disabled. (Tr. 11-13). At step three of the evaluation process, the ALJ must determine if a plaintiff's impairment or combination of impairments is severe enough to meet or medically equal the criteria of those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12). <u>See</u> 20 C.F.R. §404.1520(a)(4)(iii).

In order for a plaintiff to meet a listing requirement, the plaintiff must have a diagnosis that is included in the listings and is required to provide medical reports that document that he/she met all of the definitive criteria of the listing. <u>See</u> <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1224 (11th Cir. 2002); 20 C.F.R. § 404.1525(a)-(d). To meet the requirement of medically equaling a listing, the plaintiff's impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a); <u>see</u> <u>Wilson</u>, 284 F.3d at 1224. The Supreme Court has opined that "[a]n

impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).

It is possible for a plaintiff to meet the HIV listing if there is medical documentation regarding the plaintiff that establishes the herpes simplex virus that causes: "a. Mucocutaneous infection (for example, oral, genital, perianal) lasting one month or longer; or b. Infection at a site other than the skin or mucous membranes (for example, bronchitis, pneumonitis, esophagitis, or encephalitis); or c. Disseminated infection." 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 14.08(D)(2); see also 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 14.00(F)(3). These require documentation of proof of the HIV infection (that is, opportunistic conditions or diseases). Documentation may include laboratory evidence or "other generally acceptable methods consistent with the prevailing state of medical knowledge and clinical practice." 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 14.00(E)(2).

The undersigned notes that even though Dr. Dwyer checked the box on a form indicating that the plaintiff satisfied the above-mentioned criteria, there is insufficient medical evidence in the record to support such an opinion. There is one herpes diagnoses on the record made by Dr. Dwyer on May 29, 2015, when Dr. Dwyer diagnosed "[h]erpes simplex with other ophthalmic complications" after the plaintiff had been hospitalized for an eye infection. (Tr. 401). Even though Dr. Dwyer, based on the plaintiff's hospitalization, diagnosed the plaintiff with herpes, Dr. Dwyer indicated that he had not reviewed the plaintiff's hospital records. (Tr. 397). Dr. Dwyer only noted that his diagnosis was due to the fact that he "can think of few infections that would result in corneal scarring outside of HSV." (Tr. 401). Conversely, during the plaintiff's hospital

stay, an infectious disease doctor, Dr. Aklilu doubted that the plaintiff's eye condition was due to herpes, but rather was due to staph or strep. (Tr. 498). Accordingly, there is not sufficient medical evidence in the record to establish that the plaintiff's eye condition was due to herpes rather than some other cause. 20 C.F.R. Pt. 404, subpt. P, app.1, Listings 14.00(F)(3), 14.08(D)(2).

Moreover, even if the plaintiff provided enough documentation to demonstrate the presence of herpes, the eye surface is a mucous membrane, causing a herpes infection of the eye to be a mucocutaneous infection. As noted above, in order to satisfy Listing 14.08(D)(2)(a), a mucocutaneous herpes infection must last one month or longer in duration. However, even when Dr. Dwyer diagnosed the plaintiff's eye condition as herpes, Dr. Dwyer indicated that the plaintiff's condition had somewhat remitted. (Tr. 397). In August 2015, the plaintiff denied any eye issues and the eye examination findings by Dr. Dwyer were normal. (Tr. 390, 392). Based on the foregoing, there is insufficient evidence to demonstrate the plaintiff's infection met the requirement for duration described in Listing 14.08(D)(2)(a), and substantial evidence supports the ALJ's finding that the plaintiff's conditions failed to meet a listed impairment. (Tr. 13-17). In <u>Hutchison v. Bowen</u>, 787 F.2d 1461, 1463 (11th Cir. 1986), the Court found

> that while the ALJ did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was implicit in the ALJ's decision. The ALJ was obviously familiar with the sequential evaluation process. His statement of the relevant law recognized that an affirmative determination regarding the applicability of any Appendix 1 listing, the third step of the disability analysis, would require a determination that the appellant was disabled. Yet the record indicates that the ALJ reached the final two steps of the analysis when he determined that the appellant was unable to perform his past work and

that he did have the residual capacity for at least light work. While Appendix 1 must be considered in making a disability determination, it is not required that the Secretary mechanically recite the evidence leading to her determination. There may be an implied finding that a claimant does not meet a listing.

## II. The ALJ Properly Assessed the Plaintiff's RFC and Substantial Evidence

## Supports the ALJ's Evaluation of the Plaintiff's Subjective Complaints

At step four, in order for the ALJ to determine if the plaintiff was able to perform his past relevant work, the ALJ was required to assess the plaintiff's RFC. (Tr. 12). See 20 C.F.R. § 404.1520(e); Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004). A plaintiff's RFC is the most the plaintiff can do despite his/her limitations. The RFC is based on an evaluation of the relevant evidence in the record. See 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), (a)(3); Social Security Ruling (SSR) 96-8p, 1996 WL 374184. The ALJ must assess the plaintiff's RFC at the hearing level. See 20 C.F.R. §404.1546(c); SSR 96-5p, 1996 WL 374183; see also, 20 C.F.R. § 404.1527(d)(2) (stating that an assessment of the claimant's RFC is an issue reserved for the Commissioner); Robinson v. Astrue, 365 F. App'x 993, 999 (11th Cir. 2010).

In assessing the plaintiff's RFC, the ALJ properly considered the relevant evidence from the record. (Tr. 17-19). See 20 C.F.R. § 404.1545(a)(3). After reviewing the record, the ALJ found that the plaintiff had the RFC, with some mental restrictions, to perform medium work. (Tr. 17). See 20 C.F.R. §404.1567(c) (defining medium work); see also SSR 83-10, 1983 WL 31251, at *3 (further defining medium work). As noted by the ALJ, the record contains significant information that supports the ALJ's RFC finding. For example, the plaintiff had little mental health treatment. (Tr.

19, 240-44, 383-88).  Moreover, Dr. Montes de Oca's April 2016 mental status exam findings were normal,  (Tr. 19, 529-30), and Dr. Montes de Oca opined that the plaintiff did not have any limitations in activities of daily living because of mental symptoms. (Tr. 539).  In addition, Dr. Dwyer continually found that the plaintiff's AIDS was asymptomatic. (Tr. 19, 393, 401, 408, 415, 422, 427, 435, 695, 702, 710).  Furthermore, as noted by the ALJ, the plaintiff indicated that he was able to go to school, care for his personal needs, drive, do household chores, exercise at a gym, and socialize with his friends.  (Tr. 19, 164-66, 263, 283, 293, 314, 330, 337, 433, 526, 530).  While it is not dispositive, a plaintiff's activities may demonstrate that the plaintiff's claims of symptoms, including pain, are not as limiting as alleged.  See 20 C.F.R. § 404.1529(c)(3)(I); SSR 16-3p, 2016 WL 1119029; Dyer v. Barnhart, 395 F.3d 1206, 1212 (11th Cir. 2005); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).

   The plaintiff alleges that the ALJ's assertion that his mental impairment was not disabling was inconsistent with the government's position taken in a case regarding the plaintiff's expulsion from Miami-Dade College. The plaintiff did not cite to any law in which different governmental agencies are required to have the same position in unconnected litigation.  Moreover, the plaintiff has not shown that the measure of disability for Social Security is the same as the measure whether someone can be excluded from education at a public college due to mental impairment.  In contrast, "[t]he SSA regulations provide a decision by any nongovernmental or governmental agency concerning whether an individual is disabled, based on that agency's own rules, does not constitute an SSA decision regarding whether that individual is disabled. 20 C.F.R. § 404.1504." Ostborg v. Comm'r of Soc. Sec., 610 F. App'x 907, 914 (11th Cir.

2015). Accordingly, the undersigned finds that substantial evidence supports the ALJ's RFC assessment of the plaintiff.

At step four of the analysis, the ALJ determined that the plaintiff was not able to perform his past relevant work. (Tr. 20). <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv), (f). This led to the necessity of the ALJ's reaching the fifth step of the analysis, and the determination of whether the plaintiff could perform other work in the national economy. <u>See</u> 20 C.F.R. §404.1520(a)(4)(v), (g); <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001); <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). When a plaintiff demonstrates that he/she is unable to perform his/her past relevant work, the burden then shifts to the Commissioner to show that other work exists in the national economy that the plaintiff is capable of performing based on the plaintiff's RFC and other vocational abilities. <u>See</u> <u>Doughty</u>, 245 F.3d at 1278 n. 2; <u>Jones</u>, 190 F.3d at 1228. It is still necessary, however, in order for the plaintiff to meet his/her burden of showing he/she is disabled, for the plaintiff to demonstrate that he/she is unable to perform the other jobs identified by the Commissioner. <u>See</u> <u>Doughty</u>, 245 F.3d at 1278 n.2; <u>Jones</u>, 190 F.3d at 1228.

### III. Substantial Evidence Supports the ALJ's Reliance on VE Testimony in Finding the Plaintiff Could Perform Other Work

In order to assist in the determination of whether the plaintiff is able to perform other work in the national economy, the ALJ received testimony from a VE. (Tr. 56-60). <u>See</u> 20 C.F.R. § 404.1560(c); <u>Phillips</u>, 357 F.3d at 1242-44. The ALJ asked the VE to assume an individual with the plaintiff's age, education, work experience, and RFC. (Tr.

56-59).  The VE testified that while that type of individual could not perform the plaintiff's past relevant work, such an individual would be capable of performing other work in the national economy, such as: a hand packager; a box bender; a collator; and a small parts assembler.  (Tr. 57-59).  The VE's testimony, together with the Medical-Vocational Guidelines, gave the ALJ the significant evidence necessary to determine that the plaintiff could perform other work in the economy and that the plaintiff is not disabled.  (Tr. 20-21, 57-59).  See 20 C.F.R. § 404.1569, 404.1569a; 20 C.F.R. pt. 404, subpt. P, app. 2, table no. 3, § 203.29; Phillips, 357 F.3d at 1242-44; Wilson, 284 F.3d at 1227; Jones, 190 F.3d at 1229.

## IV. The Plaintiff Has Not Shown a Need to Have His Record Reviewed By a Physician Who Has Been Certified by the American Academy of HIV/AIDS Medicine

It is the basic obligation of an ALJ to "develop a full and fair record."  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003); see Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  "However, there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record."  Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997).  When the record contains adequate evidence for an ALJ to make an informed decision, It is not a requirement for an ALJ to gather medical expert testimony.  See Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).  In this matter, the plaintiff does not demonstrate that medical expert testimony was necessary to allow the ALJ to make a decision.  The plaintiff also does

not demonstrate that he suffered prejudice with respect to the development of the record.

## <u>CONCLUSION AND RULING</u>

The undersigned finds the ALJ's findings and ultimate decision were both based on substantial evidence and were proper.  In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment (DE# 41, 09/14/2017) is **GRANTED** and that the Plaintiff's Motion for Summary Judgment (DE# 43, 9/20/2017) is **DENIED**.  The Clerk of Court is directed to mark this case as CLOSED.

DONE AND ORDERED at the United States Courthouse, Miami, Florida this 22nd day of May, 2018.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:

All counsel of record

Adem Albra, Pro Se
860 NE 34 Street
Ft Lauderdale, Fl 33334